IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSHUA HOSKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:20-CV-395-MAB |
| | ) |
| CHARLES SWISHER, et al. | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment brought by all Defendants (Docs. 179, 189). Also before the Court is Plaintiff's "Motion for the court to consider ruling in another matter related to the defendants when ruling on both defendants motions for summary judgment" (Doc. 199) and Defendants' corresponding motion to strike Plaintiff's motion (Doc. 201).

BACKGROUND

The operative complaint in this civil rights lawsuit, filed pursuant to 42 U.S.C. § 1983, alleges that between June 5, 2019 and April 30, 2020, twenty-nine prison officials and medical providers at Pinckneyville Correctional Center conspired to deny Plaintiff Joshua Hoskins psychiatric medications and mental health care (Doc. 14). Plaintiff alleges these actions were taken in retaliation for previous grievances and lawsuits that he filed against prison staff at Pinckneyville. Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims:

> **Count 1:** Eighth Amendment deliberate indifference to medical needs claims against all Defendants for denying Plaintiff access to psychotropic medications.
>
> **Count 2:** First Amendment retaliation claim against all Defendants for denying Plaintiff access to medications in retaliation for filing grievances.

(Doc. 16). Warden Jeff Dennison was also added as a Defendant in his official capacity solely for the purpose of implementing any injunctive relief that may be ordered (*Id.*).

Defendants, Jana Reuter and Anthony Williams, who are both mental health professionals, filed their motion for summary judgment on October 12, 2022 (Doc. 179, *see also* Doc. 180). The 28 IDOC Defendants—Chad Adams, Michael Bailey, Phillip Baker, James Belford, Mark A. Bell, Russell Cooley, Jeff Dennison, Joseph Dudek, Mac-Shane Frank, Garrick Hale, Charles Heck, Derek Hermann, Matthew Johnson, Justin Jurkowski, Brandon Justice, Justin Kulich, Kale Lively, Seth Meracle, Steve Mumbower, Robert O'Leary, Patrick Peek, Wesley Shirley, Charles Swisher, Robert Tomshack, Treg Vanderkerkhove, Chad Wall, Donald Wanack, and Eric Wangler— filed their motion for summary judgment on December 14, 2022 (Doc. 189; *see also* Docs. 190–192). Plaintiff filed a response in opposition to both motions for summary judgment (Doc. 193). The IDOC Defendants filed a reply brief (Doc. 196), but Defendants Reuter and Williams did not.

After the summary judgment briefing was complete, Plaintiff filed a motion asking the undersigned, when ruling on the motions for summary judgment, to consider the order entered by District Judge Staci Yandle in another one of his cases (Doc. 199). *See* SDIL Case No. 20-cv-522-SMY, Doc. 165. The IDOC Defendants file a motion to strike Plaintiff's motion, arguing that it amounts to an impermissible sur-reply (Doc. 201).

## FACTS

Plaintiff did not deny or otherwise contest any of the facts asserted by Defendants in their motions for summary judgment (*see* Doc. 193). Nor did Plaintiff set forth his own statement of facts with appropriate citations to admissible evidence (*see* Doc. 193; *see also* Docs. 181, 190 (notices instructing Plaintiff on how to properly dispute Defendants' assertions of fact and warning him that if he failed to do so, the court could consider the fact undisputed)). *See* FED. R. CIV. P. 56(c), (e). To the extent that Plaintiff disagrees with any of Defendants' asserted facts within the body of his response brief, the Court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir.2000). Consequently, the Court accepts as uncontested the statements of fact submitted by Defendants with their motions for summary judgment, so long as the facts are supported by the cited evidence. FED. R. CIV. P. 56(e). The Court also supplements those facts with facts taken directly from the evidence submitted by the parties.

During the relevant period between June 5, 2019 and April 30, 2020, the IDOC Defendants were all officers of various types at Pinckneyville Correctional Center (*e.g.*, correctional officer, lieutenant, sergeant, etc.) (*see* Doc. 189, p. 2). Defendant Jana Reuter was a mental health nurse as of July 2019 (Doc. 180-3, p. 2). And Defendant Anthony Williams was a Qualified Mental Health Professional ("MHP") at Pinckneyville until November 30, 2019 (Doc. 180-2, p. 1).

Plaintiff Joshua Hoskins arrived at Pinckneyville on June 5, 2019, after being transferred from Stateville Correctional Center (Doc. 180-1, p. 27; Doc. 180-4, p. 2). He

was screened upon his arrival at Pinckneyville, and it was noted that he had diagnoses of bipolar disorder not otherwise specified, mood disorder not otherwise specified, and a history of depression, and he was prescribed Depakote (an anticonvulsant used to treat mania),[1] Prozac (an antidepressant), and Risperdal (an antipsychotic) (Doc. 180-2, p. 7; Doc. 180-4, p. 2). Plaintiff testified that the medications helped him control symptoms including hallucinations, manic depression, confused and/or racing thoughts, delusions, anxiety, and elevated mood swings (Doc. 180-1, pp. 65, 71–72). At the screening, Plaintiff was referred for follow-up mental health and psychiatry services (Doc. 191, p. 4).

According to Plaintiff, the day after he arrived at Pinckneyville, Defendants Hale and Swisher told him that they knew he "liked to complain to nurses" based on grievances he had filed and a lawsuit he had pending against Swisher (Doc. 189-1, pp. 35, 36). So, in order to prevent Plaintiff from interacting with nurses and complaining to them about staff conduct, Hale and Swisher told Plaintiff that "any time a nurse came to [his] cell, [he] better refuse [his] medication or [he] would receive discipline and assault" (Doc. 189-1, pp. 35, 36, 67; *see also id.* at pp. 37–38, 39). That was the first time Plaintiff was told to refuse his medications (*Id.* at p. 37). Plaintiff testified that the other IDOC Defendants also told him at various other times to refuse his medications (*Id.* at pp. 37–38, 39–40). Plaintiff testified that Anthony Williams told him to refuse his medication, and that Williams encouraged officers not to allow him to get his medication (*Id.* at pp. 100, 102,

---

[1] Depakote is an anticonvulsant used to treat certain types of seizures but is also used to treat mania in people with bipolar disorder. MAYO CLINIC, *Divalproex Sodium*, https://www.mayoclinic.org/drugs-supplements/divalproex-sodium-oral-route/description/drg-20072886 (last visited November 6, 2023).

111). And Plaintiff testified that Jana Reuter told him she had instructed officers to make sure he never received his medications, and if she found out that he had, she would falsify a sexual misconduct report against him (*Id.* at pp. 41, 88–89, 90, 93).

By Plaintiff's own admission, he told numerous people that he was being forced to refuse his medications (Doc. 189-1, pp. 40, 67, 50, 86). He said he complained directly to nurses, mental health staff, doctors and nurse practitioners, security staff, and other unspecified "non-parties" (Doc. 189-1, pp. 40, 41, 50, 57, 67, 86). He testified that officers, shift commanders, and ranking officers also knew that he was being told to refuse his medication (*Id.* at pp. 41–42, 47, 48, 52). In fact, he testified that every single security staff member he came in contact with was aware (*Id.* at p. 52; *see also id.* at p. 53 ("There was no staff members who wasn't aware of it.")). Some of the staff said there was nothing they could do about it (*Id.* at p. 41). Other staff said they would look into his complaints or report his complaints (*Id.* at pp. 41–42, 43–44, 45, 46, 48). Ultimately, nothing ever came of the reports or investigations, and no one did anything to make sure that Plaintiff got his medications (*Id.* at p. 43).

The mental health records in this case show that on June 27, 2019, Plaintiff refused to participate in a mental health evaluation with MHP Anthony Williams, but he did tell Williams that he was paranoid about staff trying to hurt him and that he had not taken his medications (Doc. 180-2, pp. 2, 9–11). Williams also noted that Plaintiff's medications (the aforementioned Depakote, Prozac, and Risperdal) had expired on June 19, 2019, and he scheduled Plaintiff for a follow-up session a week later (*Id.*)

On July 8, 2019, Plaintiff told a nurse that he had not had his psychiatric medications in two weeks, and he was referred to see psychiatric nurse practitioner, Theresa DeBord (who is a non-defendant) (Doc. 191, pp. 6, 19). Plaintiff saw DeBord that same day (Doc. 180-2, pp. 3, 12–15; *see also* Doc. 191, p. 6; Doc. 193-2, p. 44). DeBord noted that Plaintiff had tensed muscles and psychomotor agitation, he "constantly look[ed] away," his hygiene was poor, he was guarded/suspicious and uncooperative, his speech was "pressured" and rapid, his tone was impatient, his thought content was paranoid, his affect was manic and angry, and his mood was anxious (Doc. 180-2, pp. 12–15). DeBord wrote that Plaintiff "proclaimed security is making him refuse his medication" (*Id.* at p. 14). "He stated he gets them offered but the officers make him refus[e] . . . [and] they have control over what he can and can't do" (*Id.* at p. 13). Plaintiff told DeBoard about how security is "out to get [him]" due to a lawsuit he has against an officer in his housing unit (*Id.* at p. 14). DeBord wrote that she wanted to start Plaintiff on medication to reduce his manic state, but he refused all medications (*Id.*).

That same day, Plaintiff was placed on crisis watch because he was manic and "deteriorating after not being on his meds" (Doc. 180-2, pp. 16, 17; Doc. 180-4, p. 2; *see also* Doc. 191, pp. 7–18; Doc. 193-1, p. 14). NP DeBord saw Plaintiff on July 9th, while he was on crisis watch and noted, in relevant part, that she "offered patient to be placed back on medications. He would not consent. I then informed him this decision was against medical advice and he waved me away. Patient would not acknowledge me." (Doc. 180-2, p. 8; *see also* Doc. 191, pp. 12–17; Doc. 193-2, pp. 47–48).

On July 10, 2019, Plaintiff indicated that he wanted to get off crisis watch, which required him to agree to and sign a Mental Health Master Treatment Plan (Doc. 180-2, pp. 5, 17–21; *see also* Doc. 193-1, pp. 36–39). Plaintiff agreed to participate in one-on-one psychiatric sessions and psychiatric services in general (*Id.*). A week later, however, he refused to be seen by NP DeBord (Doc. 180-2, pp. 3, 22–28; Doc. 191, p. 20). He also refused to see mental health professionals throughout July, August, and September 2019, including multiple appointments with MHP Williams (*see* Doc. 180-2, pp. 4, 29–33, 36; Doc. 193-1, pp. 11, 13). MHP Williams stated in an affidavit that he was never able to professionally evaluate Plaintiff's mental health because Plaintiff refused all meetings with him (Doc. 180-2, p. 4). Plaintiff agreed at his deposition that he refused every appointment with MHP Williams (Doc. 180-1, p. 105).

The record shows that, on September 25, 2019, Plaintiff spoke with Dr. Sylvia Lane, a psychologist, regarding the reasons why he would not take psychotropic medications (Doc. 180-2, pp. 4, 34–35). Dr. Lane wrote that Plaintiff said:

> The Officer Switzer told me not to take my meds. I'm afraid. . . . I refused my meds because she (NP DeBord) said I was combative, I refused to talk with MHP Williams because he goes to tell everything to the CO's [correctional officers]. I want to get back on my meds."

(Doc. 180-2, pp. 34–35). Dr. Lane wrote that Plaintiff "describe[d] being victimized by staff in 5 house, admits he wants to take meds and is willing to participate in treatment. . . . encouraged [inmate] to comply with treatment" (*Id.*). Dr. Lane ordered a psychiatry appointment the next day and a follow-up with an MHP for treatment planning (*Id.*).

As ordered, Plaintiff met with psychiatrist, Dr. Thakurm, the next day (Doc. 193-1, pp. 40–43). Plaintiff reported auditory and visual hallucinations; he said he saw shadows and heard a "bunch of voices" telling him to harm himself and others (193-1, pp. 40–43). Plaintiff was diagnosed with bipolar disorder with psychosis (*Id.*). Dr. Thakurm prescribed Depakote, Risperdal, and Remeron (Doc. 191, p. 38). In the days that followed, however, Plaintiff refused to take the medications when nurses tried to distribute them to him, despite his statements that he wanted to go back on his medications (Doc. 191, pp. 24–25; Doc. 193-2, pp. 45, 46; Doc. 193-2, p. 16).

On October 1, 2019, Plaintiff finally submitted to a mental health evaluation with a different MHP (Doc. 193-1, pp. 21–33). He told the MHP that he was not compliant with his medications because he was being told not to take them by security staff (*Id.*). Two days later, Plaintiff saw Dr. Lane (Doc. 193-2, pp. 78–79). Dr. Lane check-marked that Plaintiff was guarded/suspicious, he looked disheveled, and his thought process was tangential and perseverating (*Id.*). She wrote that Plaintiff "appears anxious, psychomotor agitation, slump posture . . . speech tangential, seems paranoid, judgment poor" (*Id.*). She documented his diagnosis as bipolar disorder with psychosis, and she "encouraged" him to take his medications (*Id.*).

Plaintiff met with NP DeBord on November 13, 2019, December 9, 2019, and Dec. 30, 2019 (Doc. 190, pp. 85–88, 89–93, 95–98). Each time, Plaintiff reported that he does not take his medications because, if he did, officers would retaliate against him (*Id.*). NP DeBord continued Plaintiff's medications at the November 13th appointment but discontinued them at the December 9th appointment due to Plaintiff's non-compliance

in taking them (Doc. 193, pp. 89–93; Doc. 191, pp. 36, 37; *see also* Doc. 192, pp. 14–19 (medication administration records showing Plaintiff refused his medications throughout October and November 2019)). At the December 30th appointment, NP DeBord offered to start the psychiatric medications again, but Plaintiff stated, "he would not be able to take them due to officers [illegible]" (Doc. 193, p. 97).

The records show that Plaintiff met with Dr. Randy Readling, a psychiatrist, on January 8, 2020 (Doc. 193, pp. 79–83). Dr. Readling wrote that Plaintiff:

> [I]s not currently taking any psychiatric medications. He [p]resents today for an initial appointment with this Provider after being placed on Crisis Watch due to reported suicidal ideations. Somewhat hypomanic with *significant persecutory delusions*. Very little information could be obtained from the patient he insisted on explaining repeatedly how he is being targeted by staff at the facility . . . .

(*Id.*) (emphasis added). Plaintiff told Dr. Readling that he had previously taken Prozac "for depression and anxiety," Depakote "for mood stabilization," and Risperdal "for delusional thinking." (*Id.*). He reported that his symptoms were stable on these medications, and he was "agreeable to restarting them" (*Id.*). Dr. Readling accordingly prescribed the medications (*Id.*; Doc. 191, p. 35). The doctor also changed Plaintiff's diagnosis to Schizoaffective Disorder—Bipolar Type—Severe, which he felt was the most appropriate diagnosis given Plaintiff's presentation (Doc. 193, pp. 79–83). A week later, Plaintiff asked Dr. Readling to start him on Remeron to help with his sleep, depression, and anxiety, and Dr. Readling obliged (Doc. 193-2, pp. 4–8; Doc. 191, p. 34). But Plaintiff then refused to take any of the medications (Doc. 192, p. 50; Doc. 192-1, pp. 1–11).

Plaintiff continued to routinely see Dr. Readling for the remainder of January and throughout February (Doc. 193-2, pp. 49–53, 24–58, 59–62; Doc. 180-2, pp. 37–41). In the records from a March 3, 2020, appointment, Dr. Readling wrote that Plaintiff:

> states that he has not been taking the medications due to COs allegedly threatened [sic] to harm him if he did not continue to refuse his medications. As an example, the patient states today that COs Bell and Bailey were present at the 7 am medication line this morning and reminded him that he is to refuse his medications. The patient again presented somewhat hypomanic with significant persecutory delusions. The patient again insisted that he is being retaliated against due to him filing numerous grievances against staff. He also states that several COs are now involved to prevent him from taking his medications. All of these concerns have been investigated by Internal Affairs but with the patient stating IA is also part of the group at Pinckneyville who have targeted him. . . . Mr. Hoskins insists that he is interested in taking his medications once he deems it safe to do so without retaliation. . . . considering the patients strong persecutory delusions involving Pinckneyville, it may be in the patient's best interest to consider a transfer to a more specialized facility for mental health care. This was discussed with the patient today who asked that he not be transferred until his concerns at Pinckneyville have been addressed.

(Doc. 180-2, pp. 37–41).

Plaintiff remained at Pinckneyville for another year, until April 2021, when he was transferred to the psychiatric ward at Dixon Correctional Center (Doc. 189-1, pp. 18, 60, 148). Plaintiff testified that he did not have his medications for the entire time that he was at Pinckneyville (*Id.* at pp. 37, 64). Once at Dixon, he never asked for and was never given his medications; he said that he wanted to try to deal with his issues—*i.e.*, "hallucinations, hearing voices, manic depression"—without medication (Doc. 189-1, pp. 64–65). But he added that the psychiatrist "feel[s] that I should be on medication" (*Id.* at p. 65).

Jana Reuter testified via affidavit that she "did not take any action to deny [Plaintiff] access to psychotropic medication" and she "did not issue or convey any threat

to [Plaintiff]" (Doc. 180-3, p. 2). Defendant Anthony Williams similarly testified that he "did not support or encourage any act to deny [Plaintiff] access to psychotropic medication" and he was "not aware of any staff at Pinckneyville . . . threatening [Plaintiff] that he would be penalized for taking or receiving any medication or care" (Doc. 180-2, p. 5). Williams also said that, in his experience, "security staff at Pinckneyville . . . do not have a practice of preventing inmates from receiving prescribed psychotropic medications" (*Id.*). It is uncontested that "it is not permitted for security staff to prevent inmates from receiving psychotropic medications as prescribed by psychiatrists and nurse practitioners." (Doc. 180-2, p. 5)

## Discussion

### A. Plaintiff's Motion and the IDOC Defendants' Corresponding Motion to Strike (Docs. 199, 201)

In his motion, Plaintiff indicates that after he filed his response to the motions for summary judgment in this case, Judge Staci Yandle issued an order in another one of his cases, 20-cv-522-SMY, which he wants the undersigned to consider. The IDOC Defendants want to strike Plaintiff's motion as an improper sur-reply (Doc. 201).

Defendants' request to strike Plaintiff's motion is denied. The Court does not believe Plaintiff's motion amounts to a sur-reply; it is more akin to a motion to file supplementary authority. In any event, Plaintiff's motion is also denied. He did not provide any explanation as to why or how Judge Yandle's order relates to the instant case or why the undersigned should consider it (*see* Doc. 199).

The Court notes that 20-cv-522-SMY involves allegations that nine of the same

Defendants as in the instant case, during the same applicable time period between June 2019 and April 2020, denied Plaintiff personal hygiene items, showers, bedding, laundry, and adequate food in retaliation for filing grievances and lawsuits. SDIL Case No. 20-cv-522-SMY, Doc. 165. Judge Yandle denied summary judgment as to five of the Defendants. *Id.* But the undersigned cannot discern any reason why the ruling in that case would be applicable to the summary judgment order in this case. As best the Court can tell, there is little to no overlap in the facts or evidence presented in the instant case and 20-cv-522-SMY. Nor does it appear that the record in 20-cv-522-SMY contained evidence regarding Plaintiff's mental health history, which this case does and, as explained below, significantly impacts the ruling in this case.

B. **DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docs. 179, 189)**

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

Plaintiff responded to the motions for summary judgment with a 40-page

handwritten brief, making a slew of arguments, some of which are immaterial, inaccurate, and/or argue points not in dispute (Doc. 193, pp. 1–40).² Aside from those arguments, the Court can make out two main contentions, which Plaintiff repeats over and over. First, Plaintiff argues that he was prescribed and took psychotropic medications prior to Pinckneyville, without ever refusing them or accusing prison staff of forcing him to refuse them (para. 5, 22). Additionally, there is no evidence that Plaintiff refused his medications at Pinckneyville for reasons other than Defendants forcing him to do so (*Id.* at para. 32, 34). Therefore, according to Plaintiff, a reasonable jury would have to conclude that the only reason he refused his medications at Pinckneyville was because Defendants made him (*see id.* at para. 22; *see also* para. 19, 46). Second, Plaintiff argues that a reasonable jury would conclude that Defendants are the parties responsible for forcing him to refuse his medication because, if Defendants had not done anything wrong, then he would not have sued them (*Id.* at para. 32, 45, 50). And common sense says that if he was lying about Defendants being the ones who threatened him, then he would have just lied about other prison staff too and sued even more people (*Id.* at para. 4, 9, 15, 17, 19,

---

² For example, Plaintiff argues that there is no evidence that he asked Dr. Thakurm to prescribe psychiatric medications; rather, Dr. Thakurm prescribed the medications of his own accord (Doc. 193, para. 1, 24). This is immaterial to the issues in this case. As another example, Plaintiff argues there is no evidence that NP DeBord or Dr. Thakurm had the authority to administer psychotropic medications to him and "there would never be evidence like that presented . . . because the facilities nurses is the staff members who administers . . . psychotropic medications" (Doc. 193, para. 3). This is not only immaterial, but it is also incorrect. Nurse practitioners and physicians have the authority to dispense/distribute/administer medications to prisoners. Just because they did not do so for Plaintiff does not mean they are not authorized to. As a final example, Plaintiff repeatedly asserts that there is no evidence that he is not mentally ill or that he does not need medication (*e.g.*, Doc. 193, para. 7, 19, 21). No party is disputing that Plaintiff is mentally ill and in need of medication (*see* Docs. 180, 189). In fact, the Court believes the evidence in this case puts those issues beyond any reasonable dispute.

29, 35, 47, 48).

While Plaintiff believes a reasonable jury could and would side with him, after carefully considering all of the evidence, the Court does not see things the same way. Rather, the Court believes that no rational jury could credit Plaintiff's story, let alone return a verdict in his favor. Normally, credibility issues are not decided on summary judgment and must be left for a jury to decide, however, it can be done in "extreme cases," meaning where the evidence is "not just implausible, but utterly implausible in light of all relevant circumstances," such "that no rational person could believe it." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). For instance, "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id. See Harris v. Schaller*, 830 Fed. App'x 787, 788-89 (7th Cir. 2020) (unpublished) (disregarding a plaintiff's declaration where it was based on an impossibility that two inmates in two different prisons possessed the same document at the same time); *see also Machinists Dist. 10 v. GE Medical Systems, LLC*, 2008 WL 4186852, at *7 (E.D. Wis. Sept. 10, 208) (finding it "unbelievable" that a person was unaware that she hit another vehicle where the other vehicle's bumper was ripped off, the person immediately and readily admitted fault after she was confronted, and her explanations as to why she was unaware of hitting the vehicle were "shifting").

Having reviewed the record presented, the Court believes this case fits the exceptional category and Plaintiff's version of events is "so utterly implausible . . . that no rational person could believe it." *In re Chavin,* 150 F.3d at 728. The underlying basis for

both Plaintiff's Eighth Amendment deliberate indifference claim and First Amendment retaliation claim is that Defendants denied him access to his psychiatric medications by ordering him to refuse his medications when a nurse passed them out (Doc. 16; Doc. 189-1, pp. 39–40; *see also* Doc. 189, p. 2, para. 5). His story requires a jury to believe that there was a cohort of over two dozen correctional officers and two mental health professionals actively engaged in a conspiracy to get him to *not* take his psychiatric medications. And that *dozens* more staff—from officers, lieutenants, and sergeants, to MHPs, nurses, nurse practitioners, and psychiatrists—knew that he was being forced to refuse his medications but did not take any action to stop the purported threats or to otherwise ensure that he was able to take his medications.

The sheer number of people involved, and the nature of Defendants' alleged conduct, make Plaintiff's story implausible on its face. To begin with, in the realm of prisoner litigation, Plaintiff's claim that prison staff forced him to *refuse* his psychiatric medications is one of the more bizarre claims the undersigned has encountered.[3] The Court cannot fathom (and Plaintiff did not explain) why any correctional officer or mental health personnel, let alone 28 of them, would want a seriously mentally ill inmate— whose illness was well documented, *see supra* pp. 5-11—to go unmedicated, or why

---

[3] *See Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (finding that "the district courts, who are 'all too familiar' with factually frivolous claims . . . are in the best position to determine which cases fall into this category." (quoting *Neitzke v. Williams*, 490 U.S. 319, 328 (1989)); *Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002) (acknowledging district court judges have an advantage over appellate judges in recognizing when factual allegations are "incredible" because "district judges see many more prisoner suits, with their often bizarre allegations . . . ."); *Bilal v. Driver*, 251 F.3d 1346, 1349 (11th Cir. 2001) (acknowledging that district court judges are familiar with and experienced in recognizing factually frivolous claims).

dozens more would be willing to go along with it. This alleged conspiracy runs completely contrary to Defendants' interests and would only make their jobs more difficult and dangerous.[4]

As for the scope of the alleged conspiracy, there are 28 Defendants who were supposedly directly involved in ensuring Plaintiff did not to take his medication and dozens more bystanders who allegedly stood by and did nothing. As previously mentioned, these individuals run the gamut in terms of role and rank at the prison facility, from officers, lieutenants, and sergeants, to MHPs, nurses, nurse practitioners, and psychiatrists. They work in different areas of the prison and on different shifts. And they have varying job duties and responsibilities. In order to credit Plaintiff's story, the jury would have to believe that the purported conspiracy so thoroughly permeated the entire facility that no matter what time of day it was, where Plaintiff was housed, or who was on-duty, Plaintiff was going to be forced to refuse his medication. In the Court's experience, this type of all-encompassing conspiracy is not something any reasonable

---

[4] *See, e.g.,* Marie Garcia and Paul A. Haskins, *Identifying Needs Related to Managing Seriously Mentally Ill Individuals in Corrections*, CORRECTIONS TODAY, July-August 2020, pp. 22, 23 (seriously mentally ill inmates "often require more staff attention and cause more disruption" and "are harder to manage than other inmates"); Joseph D. Galanek, *Correctional Officers and the Incarcerated Mentally Ill: Responses to Psychiatric Illness in Prison*, 29 MEDICAL ANTHROPOLOGY QUARTERLY 116 (2015) ("Inmates who experienced increased [psychiatric] symptoms could become aggressive, assaultive, or engage in self-harm acts that would jeopardize institutional safety and security" and "all officers indicated that medications were a critical aspect of inmates' psychiatric stability."); Robert Keers, Simone Ullrich, Bianca L. DeStavola & Jeremy W. Coid, *Association of Violence with Emergence of Persecutory Delusions in Untreated Schizophrenia*, 171 AM. J. PSYCHIATRY 332, 335 (2014) (noting that violence in untreated patients with schizophrenia was more likely than those treated for schizophrenia or without psychosis); Fred Cohen Joel, Inmates with Mental Disorders: A Guide to Law and Practice, 16 MENTAL & PHYSICAL DISABILITY L. REP. 462, 463 (1992) ("[U]ntreated inmates with mental illnesses are more likely to be involved in serious disciplinary infractions, including assaults on staff and other inmates, as well as being the victims themselves of serious violence at the hands of more predatory inmates.").

jury would believe.

Furthermore, Plaintiff wants a jury to believe that Defendants were forcing him to refuse his medications—thereby triggering, or at the very least contributing to, a full-blown psychiatric episode that included periods of mania, hallucinations, paranoia, and delusional thinking—to retaliate against him for filing lawsuits and grievances against them or their co-workers. In other words, they intentionally drove him into a full-blown mental health crisis just because he complained about them. Prisons are unquestionably bleak places, but this level of callousness and cruelty strains credulity.

It also bears noting that Plaintiff's claims are supported only by his own testimony. However, discovery in this case has revealed that during the time Plaintiff claims prison staff made him refuse his medications, his judgment, thinking, and ability to function were impaired by mental illness, sometimes to a devastating degree. During this time, Plaintiff was variously diagnosed with very serious mental illnesses, including Bipolar Disorder with psychosis and later severe Schizoaffective Disorder—Bipolar Type. Mental health providers frequently noted that he reported or was exhibiting paranoia and delusions.[5] His condition eventually deteriorated to the point that he was transferred to a special psychiatric correctional facility. At the time of his deposition, Plaintiff remained unmedicated and admitted that he was still experiencing symptoms, including "confused

---

[5] "Delusions are defined, in part, in the DSM-5, as bizarre and implausible 'fixed beliefs that are not amenable to change in light of conflicting evidence.'" Robert S. Meyers, 2 LITIGATOR'S HANDBOOK OF FORENSIC MEDICINE, PSYCHIATRY, AND PSYCHOLOGY § 16:9 (2023) (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013)).

thoughts" and "delusions" (Doc. 189-1, p. 72). Given the implausibility of Plaintiff's claims, and the quality of the evidence in support of those claims, the Court concludes that no reasonable jury could find in favor of Plaintiff (no matter how sincerely Plaintiff believes his own story). This is one of the "extreme cases," where the evidence is "not just implausible, but utterly implausible in light of all relevant circumstances," such "that no rational person could believe it." *In re Chavin*, 150 F.3d at 728. Accordingly, Defendants are entitled to summary judgment on both of Plaintiff's claims.

## CONCLUSION

Plaintiff's "Motion for the court to consider ruling in another matter related to the defendants when ruling on both defendants motions for summary judgment" (Doc. 199) is **DENIED**. Defendants' motion to strike (Doc. 201) is **DENIED**.

The motion for summary judgment filed by Defendants Jana Reuter and Anthony Williams (Doc. 179) and the motion for summary judgment filed by Defendants Chad Adams, Michael Bailey, Phillip Baker, James Belford, Mark A. Bell, Russell Cooley, Jeff Dennison, Joseph Dudek, Mac-Shane Frank, Garrick Hale, Charles Heck, Derek Hermann, Matthew Johnson, Justin Jurkowski, Brandon Justice, Justin Kulich, Kale Lively, Seth Meracle, Steve Mumbower, Robert O'Leary, Patrick Peek, Wesley Shirley, Charles Swisher, Robert Tomshack, Treg Vanderkerkhove, Chad Wall, Donald Wanack, and Eric Wangler (Doc. 189) are **GRANTED**. Plaintiffs' claims against these Defendants are **DISMISSED with prejudice** and the Clerk of Court is **DIRECTED** to enter judgment in Defendants' favor and to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: November 9, 2023**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

### NOTICE TO PLAINTIFF

Plaintiff is advised that this is a final decision ending his case in this Court. If Plaintiff wishes to contest this decision, he has two options: he can ask the undersigned to reconsider the Order or he can appeal to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal in the district court *within 30 days* from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard). The current cost of filing an appeal with the Seventh Circuit is $505.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C).

On the other hand, if Plaintiff wants to start with the undersigned, he can file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), but such a motion is not required to preserve his appellate rights. Any Rule 59(e) motion *must* be filed within twenty-eight (28) days of the entry of judgment. FED. R. CIV. P. 59(e), and the deadline *cannot* be extended. *See* FED. R. CIV. P. 6(b)(2). Any motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010) ("This court has held that otherwise timely skeletal motions that fail to satisfy the requirements of FED. R. CIV. P. 7(b)(1) do not postpone the 30–day period for filing a notice of appeal . . . .").

So long as the Rule 59(e) motion is in proper form and filed no later than 28 days after the judgment is entered, the 30-day clock for filing a notice of appeal will be stopped. FED. R. APP. P. 4(a)(4). The clock will start anew once the motion is ruled on. FED. R. APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal, and the clock will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano*, 273 F.3d at 760–61; *Martinez v. Trainor*, 556 F.2d 818, 819–20 (7th Cir. 1977).